Filed 12/2/25  P. v. Walton CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RICHARD JAMES WALTON,<br><br>    Defendant and Appellant. | F088684<br><br>(Super. Ct. No. CF98606442)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Michael G. Idiart, Judge.

Sandra Gillies, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Eric Christoffersen, Galen N. Farris and Joseph Penney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Appellant Richard James Walton was sentenced to 38 years to life for first degree murder and attempted murder offenses committed in 1997. In 2023, he petitioned for resentencing relief under Penal Code section 1170, subdivision (d) (section 1170(d))[1] and pursuant to *People v. Heard* (2022) 83 Cal.App.5th 608 (*Heard*). Section 1170(d)(1)(A) affords an opportunity for recall and resentencing only to those juveniles who were sentenced to an explicit term of life without parole (LWOP). *Heard* held that section 1170(d) violates equal protection principles to the extent it excludes from relief those juveniles sentenced to the functional equivalent of LWOP. In considering appellant's section 1170(d) petition under *Heard*'s equal protection analysis, the trial court concluded appellant's sentence was not the functional equivalent of LWOP, and denied relief under section 1170(d)(1)(A).

On appeal, appellant's equal protection argument extends *Heard* and operates on the premise that the functional equivalence of LWOP should be guided by the formulation of functional equivalency articulated by the California Supreme Court in *People v. Contreras* (2018) 4 Cal.5th 349 (*Contreras*) in the context of the federal Constitution's Eighth Amendment. *Contreras* analyzed whether sentences of 50 and 58 years to life imposed on juveniles for nonhomicide crimes were functionally equivalent to juvenile LWOP sentences the United States Supreme Court had categorically prohibited in *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*) and were, therefore, unlawful under the Eighth Amendment. *Contreras* centered its Eighth Amendment functional equivalence assessment on *Graham*, evaluating whether the juvenile sentences at issue provided the type of "'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation'" that *Graham* requires, and

---

[1]    Further statutory references are to the Penal Code unless otherwise indicated.

ultimately found the sentences unlawful under the Eighth Amendment. (*Contreras, supra*, at p. 367, quoting *Graham, supra*, at p. 75.)

The Courts of Appeal are presently split on whether *Contreras*'s Eighth Amendment formulation of functional equivalency applies to equal protection challenges to section 1170(d) based on *Heard*, and whether a sentence of 50 years to life for homicide crimes constitutes the functional equivalent of LWOP in that context. In *People v. Cabrera* (2025) 111 Cal.App.5th 650 (*Cabrera*), our colleagues in the Second District Court of Appeal, Division Five, relied on *Contreras* in concluding a sentence of 50 years to life for first degree murder committed by a juvenile when he was 15 years old was the functional equivalent of LWOP in the context of an equal protection challenge to section 1170(d) and, thus, under *Heard*, denying the petitioner relief violated equal protection principles. (*Cabrera, supra*, at p. 653.) Arriving at a different conclusion, our colleagues in the Second District Court of Appeal, Division Seven, distinguished *Contreras* in *People v. Munoz* (2025) 110 Cal.App.5th 499 (*Munoz*), review granted June 25, 2025, S290828, and concluded a sentence of 50 years to life for first degree murder committed by a 15-year-old juvenile was not the functional equivalent of LWOP in the context of an equal protection challenge to section 1170(d). (*Munoz, supra*, at pp. 503, 512, review granted.)

In accord with *Munoz*, our colleagues in the Second District Court of Appeal, Division Three, likewise concluded in *People v. Thompson* (2025) 112 Cal.App.5th 1058, review granted September 24, 2025, S292540 (*Thompson*) that section 1170(d)(1)(A)'s exclusion of a petitioner's sentence of 50 years to life for first degree murder committed when he was 17 years old did not violate equal protection. *Thompson* reasoned *Contreras*'s Eighth Amendment functional equivalency analysis was distinct from, and should not be conflated with, an equal protection analysis regarding section 1170(d). (*Thompson, supra*, at pp. 1075–1082, review granted.) Rather than importing *Contreras*'s Eighth Amendment functional equivalency formulation, the court structured

3.

its analysis of the petitioner's equal protection challenge to section 1170(d) around the California Supreme Court's recent equal protection decisions in *People v. Hardin* (2024) 15 Cal.5th 834 (*Hardin*) and *People v. Williams* (2024) 17 Cal.5th 99 (*Williams*).

Having granted review in *Munoz*, our Supreme Court is poised to address whether a juvenile homicide offender sentenced to 50 years to life in prison is entitled to recall and resentencing under section 1170(d)(1) on the ground that the sentence is the functional equivalent of LWOP. While we await further guidance from our high court on this question and the analytical framework to answer it, we are persuaded by *Thompson*'s conclusion that an equal protection challenge to section 1170(d) requires "an equal protection specific" analysis that is not centered on Eighth Amendment concerns. (*Thompson, supra*, 112 Cal.App.5th at p. 1073, review granted.) A panel of this court recently joined *Thompson*'s reasoning in *People v. Baldwin* (2025) 113 Cal.App.5th 978 (*Baldwin*), and concluded that, as applied to a juvenile nonhomicide offender sentenced to 44 years to life, section 1170(d)'s eligibility limitation to those sentenced expressly to LWOP does not violate equal protection principles.

Applying *Baldwin* here, we affirm the trial court's denial of appellant's petition. We find appellant has failed to demonstrate—as is his burden—that section 1170(d)'s limitation on eligibility to those sentenced expressly to LWOP has no rational basis, and is therefore unconstitutional under the Fourteenth Amendment, as applied to a juvenile homicide offender sentenced to 38 years to life.

## FACTUAL BACKGROUND

Appellant was 16 years old at the time of the offenses in March 1997. Based on facts contained in the probation report, appellant walked up to a parked vehicle in which two people (one of whom appellant believed to be a gang rival) were sitting, asked for a cigarette, and then began firing a gun at the two individuals in the vehicle. One individual was killed, and the other was permanently injured.

Appellant was charged with murder (§ 187, subd. (a)), attempted murder (§§ 187, subd. (a), 664, subd. (a)) and assault (§ 245, subd. (a)(1)). A firearm enhancement was alleged as to the murder and attempted murder counts (§ 12022.5, former subd. (a)(1)); a gang enhancement was alleged as to the murder count (§ 186.22, subd. (b)); and a great bodily injury (GBI) enhancement was alleged as to the attempted murder count (§ 12022.7, subd. (b)). In 1999, appellant entered into a stipulated plea agreement whereby he pleaded guilty to first degree murder and attempted murder, and he admitted all attached enhancement allegations in exchange for an aggregate sentence of 38 years to life. The court imposed the negotiated sentence of 38 years to life as follows: A 10-year aggravated term for the firearm enhancement; a three-year term for the gang enhancement; plus 25 years to life for the underlying conviction for murder. The sentences imposed on count 2 for attempted murder and the GBI enhancement were ordered to be served concurrently to the sentence on count 1.[2]

In July 2023, appellant filed a petition for resentencing under section 1170(d) pursuant to *Heard*. He argued his sentence was the functional equivalent of LWOP, in part because research articles presented to the trial court showed that his life expectancy was likely reduced by his incarcerated living conditions. The trial court found his sentence was not the functional equivalent of LWOP, and denied his petition for relief under section 1170(d).

---

[2] The assault charge in count 3 was dismissed in the interests of justice.

# DISCUSSION

## I.    Legal Background

To provide context for appellant's equal protection challenge to section 1170(d) under *Heard,* we begin with a summary of the legal background.

### A.    Functional Equivalence of LWOP in the Eighth Amendment Context

The law governing juvenile punishment has undergone a sea change since appellant was sentenced in 1999, "based upon developments in scientific research on adolescent brain development confirming that children are different from adults in ways that are critical to identifying age-appropriate sentences." (*O.G. v. Superior Court* (2021) 11 Cal.5th 82, 88.) "As a result of this shift, the punishment that could validly be imposed on juvenile offenders was curtailed. The changes in law also restricted prosecutors' authority to charge juveniles in adult criminal court." (*People v. Bagsby* (2024) 106 Cal.App.5th 1040, 1048 (*Bagsby*).)

Beginning with *Roper v. Simmons* (2005) 543 U.S. 551, 568, the United States Supreme Court held the Eighth Amendment categorically prohibits sentencing juvenile offenders to death. In 2010, the nation's high court expanded *Roper* and held the Eighth Amendment also prohibits sentencing *nonhomicide* juvenile offenders to LWOP; only by giving such offenders "some realistic opportunity to obtain release" would punishment provided by the states comport with the Eighth Amendment. (*Graham, supra*, 560 U.S. at p. 82.) Two years later, although not extending *Graham*'s categorical LWOP ban to juvenile *homicide* offenders, the United States Supreme Court held the Eighth Amendment prohibits a sentencing scheme that makes LWOP a mandatory sentence for juvenile offenders convicted of homicide. (*Miller v. Alabama* (2012) 567 U.S. 460, 489 (*Miller*).) *Miller* outlined mitigating factors relating to youth that must be considered by the sentencing court before committing a juvenile homicide offender to prison for LWOP, and explained the "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." (*Id.* at p. 479.)

About two months after *Miller*, the California Supreme Court extended *Graham*, holding the Eighth Amendment prohibits sentencing *nonhomicide* juvenile offenders to a "term-of-years sentence that amounts to the functional equivalent of a [LWOP] sentence .…" (*People v. Caballero* (2012) 55 Cal.4th 262, 268, fn. omitted (*Caballero*).) The court's analysis centered on *Graham* and its holding that the Eighth Amendment requires the state to afford a juvenile offender a "'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation .…'" (*Caballero, supra*, at p. 266.) *Caballero* explained *Miller* had emphasized that "'none of what [*Graham*] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime specific.'" (*Caballero, supra*, at p. 267.) Rather, *Miller* had "made it clear that *Graham*'s 'flat ban' on [LWOP] sentences applies to all nonhomicide cases involving juvenile offenders, including the term-of-years sentence that amounts to the functional equivalent of a [LWOP] sentence imposed in this case." (*Caballero, supra*, at pp. 267–268, fn. omitted.) Sentenced to 110 years to life, *Caballero* explained the defendant would become parole eligible "over 100 years from now," and "he would have no opportunity to 'demonstrate growth and maturity' to try to secure his release, in contravention of *Graham*'s dictate." (*Id.* at p. 268.)

After the United States Supreme Court's decisions in *Graham* and *Miller*, our Legislature enacted Senate Bill No. 9 (2011–2012 Reg. Sess.) (Senate Bill 9) that added subdivision (d)(2) to section 1170; the added subdivision became effective January 1, 2013, and created a recall and resentencing provision for juveniles sentenced to an explicit term of LWOP. (See Stats. 2012, ch. 828, § 1.) The statute permitted a resentencing mechanism for those defendants who were under the age of 18 years at the time of the commission of their offenses and who were sentenced to LWOP. In the process of passing the bill, a legislative report included comments from the bill's author and supporters that "sentencing minors to die in prison is barbaric" (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.), as amended

7.

Aug. 15, 2011, p. 2), and discussed that the proposed remedy of recall and resentencing would, if deemed appropriate by the sentencing judge, "result in a life sentence, but one with the possibility of parole" (*ibid.*). Under the statute's new provision, a defendant was permitted to file a petition requesting recall and resentencing with the sentencing court after having been incarcerated for 15 years. (§ 1170, former subd. (d)(2)(A)(i), now subd. (d)(1)(A).)[3]

Then, effective January 1, 2014, the Legislature passed Senate Bill No. 260 (2013–2014 Reg. Sess.) (Senate Bill 260) and added sections 3051, 3046, subdivision (c), and 4801, subdivision (c) to the Penal Code "'to bring juvenile sentencing into conformity with *Graham*, *Miller*, and *Caballero*.'" (*Heard, supra*, 83 Cal.App.5th at p. 619; see § 3051, subd. (b)(1)–(3), added by Stats. 2013, ch. 312, § 4.) Section 3051 requires the Board of Parole Hearings to conduct a youthful offender parole hearing "at specified times during the incarceration of certain youthful offenders." (*People v. Sorto* (2024) 104 Cal.App.5th 435, 443–444 (*Sorto*).) Although section 3051, as originally enacted, created a schedule of youth offender parole hearings for juvenile offenders sentenced to a determinate term, a term of less than 25 years to life, or a life term of 25 years to life, it provided no parole hearing for juvenile offenders sentenced to LWOP. (*Heard, supra*, at p. 619 & fn. 8.)

The California Supreme Court considered the effect of Senate Bill 260 on a juvenile's claim of an Eighth Amendment violation in sentencing. (*People v. Franklin* (2016) 63 Cal.4th 269 (*Franklin*).) In *Franklin*, a 16-year-old defendant shot and killed another teenager, and was convicted of first degree murder with a firearm enhancement; he was sentenced to two consecutive terms of 25 years to life—i.e., 50 years to life. (*Id.* at p. 271.) *Franklin* held that, "just as *Graham* applies to sentences that are the

---

[3]     Effective January 1, 2022, section 1170(d)(2) was renumbered as subdivision (d)(1). (Stats. 2021, ch. 731, § 1.3.)

'functional equivalent of a [LWOP] sentence' [citation], so too does *Miller* apply to such functionally equivalent sentences." (*Id.* at p. 276.) *Franklin* concluded, however, that the availability of a youth offender parole hearing under section 3051 mooted the defendant's Eighth Amendment challenge to his sentence under *Miller*. (*Franklin, supra*, at pp. 279–280.) Although the defendant remained bound by his original sentence, the court explained, by operation of Senate Bill 260, the defendant "is now serving a life sentence that includes a meaningful opportunity for release during his 25th year of incarceration. Such a sentence is neither LWOP nor its functional equivalent. Because [the defendant] is not serving an LWOP sentence or its functional equivalent, no *Miller* claim arises here." (*Franklin, supra*, at pp. 279–280.)

Subsequently, in 2017, our Supreme Court held that section 1170(d) was an inadequate statutory mechanism to cure an error under *Miller*. (*In re Kirchner* (2017) 2 Cal.5th 1040, 1054–1055 (*Kirchner*.) The court explained that section 1170(d) provided "only a selective and qualified remedy … premised on an inquiry that may, but does not necessarily, overlap with the one demanded under *Miller*." (*Kirchner, supra*, at pp. 1054–1055.) After *Kirchner*, the Legislature amended section 3051 to add subdivision (b)(4), which provides juveniles sentenced to LWOP a youth offender parole hearing during their 25th year of incarceration. (§ 3051, subd. (b)(4), added by Stats. 2017, ch. 684, § 1.5.) Nevertheless, the Legislature did not repeal section 1170(d).

Months after section 3051 was amended, our Supreme Court again considered the legality of juvenile sentences under the Eighth Amendment for nonhomicide offenses in *Contreras*. Although not sentenced to the 110-year-to-life term in *Caballero*, two juveniles had been sentenced to 50 and 58 years to life for One Strike nonhomicide offenses and were ineligible for youth offender parole hearings under section 3051. (*Contreras, supra*, 4 Cal.5th at p. 359.) The court centered its analysis on *Graham*'s Eighth Amendment requirement that nonhomicide juvenile offenders must be given

9.

"'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'" (*Contreras, supra*, at p. 367.)

Through the lens of *Graham*, the court reasoned a lawful sentence under the Eighth Amendment must "recognize 'a juvenile nonhomicide offender's capacity for change and limited moral culpability'"; "offer 'hope of restoration'"; offer "'a chance to demonstrate maturity and reform'"; provide a "'chance for fulfillment outside prison walls,' and a 'chance for reconciliation with society'"; and offer "the juvenile offender an 'incentive to become a responsible individual.'" (*Contreras, supra*, 4 Cal.5th at p. 367.) Given these guidelines, *Contreras* held a sentence of 50 years to life is functionally equivalent to LWOP for a juvenile nonhomicide offender because it does not provide the opportunities *Graham* requires. *Contreras* explained *Graham* "envisioned more than the mere act of release or a de minimis quantum of time outside of prison.… Confinement with no possibility of release until age 66 or age 74 seems unlikely to allow for the reintegration that *Graham* contemplates." (*Contreras, supra*, at p. 368.)

**B. Eighth Amendment Arguments in the Equal Protection Context**

After *Contreras*, our high court considered constitutional questions about youth offender parole opportunities provided under section 3051 in *Hardin, supra*, 15 Cal.5th 834 and *Williams, supra*, 17 Cal.5th 99. In *Hardin,* the defendant was serving an LWOP sentence for a special circumstance murder he committed at age 25. (*Hardin, supra*, at p. 839.) Although section 3051 permitted youth offender parole hearings for most offenders incarcerated for a crime they committed between ages 18 and 25, the statute excluded from youth offender parole hearings those serving LWOP for a crime they committed after the age of 18. (*Hardin, supra*, at p. 838.) The defendant argued section 3051 violated the Fourteenth Amendment's equal protection guarantee by excluding from early parole opportunities young adult offenders sentenced to LWOP for special circumstance murder, but extending parole opportunities to young adult offenders serving parole-eligible life sentences for other crimes. (*Hardin, supra*, at p. 839.) Our

10.

high court ultimately concluded the Legislature had a rational basis for the exclusion of young adults sentenced to LWOP based on its concerns about culpability and the appropriate level of punishment for certain very serious crimes.  (*Hardin, supra*, at pp. 853–864.)

Notably, the court rejected the defendant's argument premised on the functional equivalence doctrine:  a young adult offender sentenced to a lengthy term-of-years sentence that is functionally equivalent to LWOP would be entitled to a youth offender parole hearing, while a young adult offender serving an explicit sentence of LWOP would not.  (*Hardin, supra*, 15 Cal.5th at p. 863.)  The appellate court below had concluded this distinction was irrational because it permitted parole hearings for those defendants with lengthy term-of-years sentences who perhaps had committed multiple violent crimes and were, in some cases, sentenced to the functional equivalence of LWOP, while denying a parole opportunity to those defendants explicitly sentenced to LWOP, perhaps for only a single crime.  (*Id.* at pp. 841–842.)  The appellate court reasoned the seriousness of the offender's crimes was only a superficially plausible justification for the distinction.  (*Id.* at p. 842.)  In raising this culpability issue before the Supreme Court, the defendant noted the high court had previously described aggregate sentences that fix parole eligibility outside an offender's life expectancy as the functional equivalence of LWOP, and essentially argued a sentence functionally equivalent to LWOP could involve the same degree of culpability as those sentenced to LWOP, making a distinction based on culpability an irrational one.  (*Id.* at p. 863.)

In rejecting this argument, our high court explained it had "employed that [functional equivalence] description in the context of identifying the category of juvenile offenders to whom the Eighth Amendment limitations on [LWOP] sentences apply; for that purpose, what matters is only whether the sentence, by its nature, forecloses any realistic chance for a juvenile offender to rejoin society.  [Citation.]  We have not held that a lengthy term-of-years sentence is necessarily equivalent to a [LWOP] sentence for

11.

all purposes. Nor, more specifically, have we suggested that a set of crimes punishable by a lengthy term-of-years sentence is necessarily more culpable, or equivalent in culpability, to a single crime for which the law prescribes a sentence of [LWOP]." (*Hardin, supra*, 15 Cal.5th at pp. 863–864.)

Finally, in *Williams*, our high court again considered an equal protection challenge to section 3051—this time based on its exclusion of all youth offenders sentenced under the One Strike law. (*Williams, supra*, 17 Cal.5th at pp. 112–113.) The defendant argued there was no rational basis to exclude One Strike offenders, which involve nonhomicide offenses, but not those convicted of first degree murder from parole eligibility. (*Id.* at p. 125.) The defendant's argument was premised, in part, on *Graham*'s statement "that homicide offenses differ 'in a moral sense' from nonhomicide offenses in terms of ""their ""'severity and irrevocability."""" (*Williams, supra*, at p. 125, quoting *Graham, supra*, 560 U.S. at p. 69.)

The high court observed "[t]his argument based on the comparative seriousness of crimes, however, is premised on concerns relevant in the context of Eighth Amendment challenges to the death penalty and other severe criminal penalties, such as juvenile LWOP; such concerns do not necessarily establish whether a Legislature's classification violates equal protection under a rational basis standard." (*Williams, supra*, 17 Cal.5th at p. 131.) The court acknowledged section 3051 "was crafted to 'bring juvenile sentencing in conformity with *Miller*, *Graham* and *Caballero*' [citation], and to that end, Eighth Amendment 'protections outlined in *Miller*' are featured in this provision. [Citation.] However, despite 'language echoing the holdings of these cases' [citation], this equal protection analysis of section 3051 should not be conflated with principles governing the Eighth Amendment's prohibition against cruel and unusual punishment and its focus on punishment and proportionality in capital and juvenile LWOP sentencing." (*Williams, supra*, at p. 131.) Based on recidivism concerns and that the aggravated nature of their offenses diminished their prospects for rehabilitation, the court ultimately concluded the

Legislature "had a rational reason to categorically exclude young adult One Strike offenders, but not young adults convicted of non-special-circumstance murder, from early parole consideration under section 3051." (*Id.* at p. 133.)

### C. Equal Protection Challenges to Section 1170(d)(1)(A) and Sentences Functionally Equivalent to LWOP

The concept of functional equivalence of LWOP also arose in the context of equal protection challenges to section 1170(d). To reiterate, section 1170(d) permits a defendant who was under the age of 18 at the time of the commission of the offense for which the defendant was sentenced to LWOP and has been incarcerated for at least 15 years, to submit a petition for recall and resentencing to the sentencing court. (§ 1170(d)(1)(A).)

In *Heard*, decided before *Hardin* or *Williams*, the court addressed an equal protection challenge to section 1170(d) and its exclusion of juveniles who were not sentenced to an explicit term of LWOP. The defendant, who had been sentenced to a term of 103 years to life, argued his sentence was the functional equivalent of LWOP, and if section 1170(d)(1) was not interpreted to apply to his sentence, then it violated his right to equal protection. (*Heard, supra*, 83 Cal.App.5th at p. 626.) As matter of statutory construction, the court first determined the plain language of section 1170(d)(1)(A) limited eligibility for recall and resentencing to juvenile offenders sentenced explicitly to LWOP. (*Heard, supra*, at p. 626.) Turning to the equal protection challenge, the court first concluded the defendant was similarly situated to those offenders sentenced explicitly to LWOP because his sentence was "the functional equivalent" of LWOP. (*Id.* at p. 629.) In making this determination, the court embraced no specific analytical method for determining what term-of-years sentence constituted the functional equivalent of LWOP; instead, the court relied on *Caballero*'s application of functional equivalency and explained the defendant would have to serve 103 years before

becoming parole eligible, which "constitutes a de facto [LWOP] sentence." (*Heard, supra*, at p. 629.)

On the second prong of the analysis, the court found it could "conceive of no legitimate reason for making juvenile offenders sentenced to explicit [LWOP] terms eligible to seek resentencing but not juvenile offenders sentenced to the equivalent of a [LWOP] sentence." (*Heard, supra*, 83 Cal.App.5th at p. 632.) The court reasoned the Legislature could not rationally base the distinction on the excessiveness of an LWOP sentence because the same concern applies to those with a functionally equivalent term-of-years sentence. (*Ibid.*) Differential treatment also could not be justified, the court reasoned, by differences in the relative culpability of each group. The statute had the "incongruous effect" of extending sentencing leniency (resentencing) to those offenders generally regarded as the least deserving of it—i.e., juveniles convicted of first degree murder whose cases involve a special circumstance finding and whose punishment is explicit LWOP. (*Id.* at p. 633.) The court also considered, and rejected, whether the Legislature might have viewed a juvenile whose multiple offenses caused a lengthy term-of-years sentence as more deserving of severe punishment. The court pointed out section 1170(d)(1)(A) includes those with explicit LWOP sentences regardless of whether they are convicted of other additional offenses, so the number of offenses theoretically committed by each group of offenders (LWOP offenders versus de facto LWOP offenders) failed to justify their disparate treatment. (*Heard, supra*, at p. 633.)

Two years later, in *Sorto*, the court reviewed the denial of a section 1170(d) petition where the defendant had been sentenced to a determinate term of 10 years, plus an indeterminate term of 130 years to life. (*Sorto, supra*, 104 Cal.App.5th at pp. 439–440.) The appellate court confirmed *Heard*'s equal protection analysis, and concluded neither *Hardin* nor *Franklin* undercut it.[4] Consistent with *Heard*, the court found there

---

[4]    In *People v. Ortega* (2025) 111 Cal.App.5th 1252, review granted September 17, 2025, S292070, our colleagues in the Fourth District Court of Appeal, Division Three, parted company

14.

was no rational basis for section 1170(d) to exclude from relief those juveniles serving sentences that were the functional equivalent of LWOP. The court rejected the Attorney General's arguments the Legislature had a rational basis to distinguish LWOP as a response to *Graham*; or based on moral principles; empirical facts; fiscal concerns; and relative culpability. (*Sorto, supra*, at pp. 450–454.)

After *Sorto*, the Fourth District Court of Appeal, Division One, in *Bagsby* rejected the Attorney General's argument *Heard* was wrongly decided, and concluded a sentence of 107 years to life for offenses committed when the juvenile was 15 years old was the functional equivalent of LWOP, and there was no rational basis for section 1170(d) to differentiate between LWOP and those sentenced to de facto LWOP. (*Bagsby, supra*, 106 Cal.App.5th at pp. 1054–1067.)

Like *Caballero*, these section 1170(d) cases (*Heard*, *Sorto* and *Bagsby*) involved term-of-years sentences with a parole eligibility date that was unquestionably beyond the juvenile's natural life span. None of these cases confronted how functional equivalence should be assessed when a defendant's term-of-years sentence could potentially offer a parole opportunity *inside* the juvenile's natural life. Courts have varied as to the rationale

---

with *Heard* and *Sorto* regarding how eligibility for a youth offender parole hearing under section 3051 affects an equal protection challenge to section 1170(d). (*Ortega, supra*, at pp. 1263–1264, review granted.) Relying on *Franklin*, the court in *Ortega* reasoned that because the defendant was eligible for a section 3051 youth offender parole hearing, his sentence of 42 years to life had been converted by operation of law to a sentence of 25 years to life. Based on this, the court concluded the defendant's sentence was not the functional equivalent of LWOP, and the defendant's equal protection challenge to section 1170(d) was moot. (*Ortega, supra*, at pp. 1264–1265, review granted.) Prior to *Ortega*, *Heard* and *Sorto* had declined to adopt similar reasoning and had concluded that, although section 3051 may change how a defendant's sentence currently operates, section 1170(d)'s plain language requires only that a defendant "was sentenced" to an LWOP term. (*Heard, supra*, 83 Cal.App.5th at p. 629; accord, *Sorto, supra*, 104 Cal.App.5th at pp. 447–448.) In accord with *Ortega*, our colleagues in the Third District Court of Appeal held in *People v. Isayev* (2025) 113 Cal.App.5th 1117, 1144, review granted November 12, 2025, S292860, that where a "defendant has become eligible for a youth offender parole hearing [under section 3051] and, consequently, is no longer serving LWOP or its functional equivalent, the defendant is not eligible for recall and resentencing under section 1170, subdivision (d)."

15.

for making this determination in the equal protection context and exactly where the line should be drawn for functional equivalence when a term-of-years sentence offers an opportunity for parole that is probably, or at least possibly, inside the juvenile's natural life expectancy.

For example, in *People v. Olmos* (2025) 109 Cal.App.5th 580, our colleagues in the Second District Court of Appeal, Division Five, concluded a sentence of 33 years to life is not the functional equivalent of LWOP for purposes of section 1170(d) pursuant to *Heard*'s equal protection analysis. Accepting *Heard*'s equal protection analysis arguendo, the court reasoned a 33-year-to-life sentence was readily distinguishable from the sentence of 103 years to life in *Heard* (*Heard, supra*, 83 Cal.App.5th at p. 629), 140 years to life in *Sorto* (*Sorto, supra*, 104 Cal.App.5th at pp. 439–440), and was far shorter than the 50- and 58-year sentences imposed on the juveniles in *Contreras* (*Contreras, supra*, 4 Cal.5th at p. 356). (*Olmos, supra*, at p. 583.)

In *Munoz*, a split panel of our colleagues in the Second District Court of Appeal, Division Seven, concluded that a 50-year-to-life term for a juvenile homicide offender is not the functional equivalent of LWOP in the context of an equal protection challenge to section 1170(d). The majority distinguished *Heard*, *Sorto*, and *Bagsby* because those cases involved life terms with minimum parole eligibility dates far greater than 50 years. (*Munoz, supra*, 110 Cal.App.5th at pp. 510–512, review granted.) Despite that *Caballero*, a nonhomicide Eighth Amendment case, "gave some guidance" about how to ascertain functional equivalency, *Munoz* concluded it was not controlling and similarly distinguishable. (*Munoz, supra*, at p. 508, review granted.) *Caballero*, like *Heard*, *Sorto*, and *Bagsby*, considered a defendant with parole eligibility after more than 100 years of incarceration—a sentence that obviously would not provide a meaningful opportunity to secure release during the juvenile's expected lifetime. *Munoz* reasoned that unlike the defendant in *Caballero*, Munoz would be 65 years old when he became eligible for

parole, and thus *would* have a realistic opportunity to obtain release from prison during his expected lifetime. (*Munoz, supra*, at p. 508, review granted.)

In declining to consider various extra-record evidence showing Munoz would likely die in prison before reaching his parole eligibility date, the court explained the data was not presented to the trial court, and it would not evaluate its untested validity. (*Munoz, supra*, 110 Cal.App.5th at pp. 508–509, review granted.) The court noted it was the function of the Legislature, not the courts, to sift through studies and research to make policy decisions. (*Id.* at p. 509, review granted.) The *Munoz* majority also reasoned that *Contreras*'s formulation of functional equivalency did not govern the analysis because it was an Eighth Amendment case in a nonhomicide context. (*Munoz, supra*, at pp. 510–511, review granted.)

The dissent in *Munoz* maintained *Contreras*'s reasoning "must inform" the functional equivalence analysis for equal protection purposes as section 1170(d) "was enacted in response to the principles articulated in *Graham*[*, supra,*] 560 U.S. 48 … — the decision at the heart of *Contreras*." (*Munoz, supra*, 110 Cal.App.5th at p. 513, review granted (dis. opn. of Feuer, J.).) The dissent relied on various studies and statistics cited by the defendant and amici curiae filings, including those showing the average age of death of California inmates between 2010 and 2012 was 54–55 years of age (*id.* at p. 515, review granted); and how juveniles are disproportionately subjected to childhood trauma that is linked to higher mortality rates (*id.* at p. 517, review granted). The dissent concluded that a term of 50 years to life imposed on a 15- or 16-year-old "is the functional equivalent of an LWOP sentence because a substantial percentage of juvenile offenders will die in prison or be released at the end of their lifetimes, without a meaningful opportunity to become productive members of society." (*Id.* at p. 517, fn. omitted, review granted.)

Subsequently, relying on *Contreras*, our colleagues in the Second District Court of Appeal, Division Five, concluded a 50-year-to-life sentence for a juvenile homicide

17.

offender is functionally equivalent to LWOP for equal protection purposes under section 1170(d).  (*Cabrera, supra*, 111 Cal.App.5th at p. 653.)  A separate concurring statement explained that, "[w]ere the slate clean, I would defer to our Legislature's decision as to where to draw the line between entitlement and nonentitlement to relief under … section 1170, subdivision(d)(1)(A)—at least in a case, like this one, where the question presented is whether there is a rational basis to distinguish a sentence of 50 years to life from a [LWOP] sentence.  However, our Supreme Court's holding in *People v. Contreras* (2018) 4 Cal.5th 349, 369 … is, in my view, inescapable and indistinguishable."  (*Id.* at p. 654 (conc. opn. of Hoffstadt, P.J.).)

Then, in *Thompson,* our colleagues in the Second District Court of Appeal, Division Three, agreed with the majority in *Munoz* that section 1170(d)'s exclusion of a juvenile sentenced to 50 years to life for a homicide offense did not violate equal protection principles.  (*Thompson, supra*, 112 Cal.App.5th at p. 1072, review granted.)  *Thompson* explained that *Contreras* had limited the question before it regarding functional equivalence "'*to the Eighth Amendment concerns that constrain lawful punishment for juvenile nonhomicide offenders* .…'"  (*Thompson, supra*, at p. 1072, review granted, quoting *Contreras, supra*, 4 Cal.5th at p. 364.)  *Thompson* found this to specifically tether the functional equivalence question before *Contreras* to the Eighth Amendment, particularly in light of the high court's statements in *Hardin* and *Williams* "rejecting attempts to collapse the separate Eighth and Fourteenth Amendment analyses into one."  (*Thompson, supra*, at p. 1073, review granted, citing *Williams, supra*, 17 Cal.5th at p. 131 & *Hardin, supra*, 15 Cal.5th at p. 863.)

Thus, *Thompson* explained, because *Contreras* had addressed functional equivalence under Eighth Amendment standards, and *not* under the equal protection guarantee of the Fourteenth Amendment, its Eighth Amendment concerns in determining functional equivalency did not extend to an equal protection challenge under section 1170(d).  For purposes of equal protection, *Thompson* explained, rather than

"asking whether a 50-year-to-life term functions like [LWOP] with respect to Eighth Amendment concerns that constrain lawful punishment for juvenile nonhomicide offenders, we must ask whether '"a statutory distinction [between [LWOP] and a 50-year-to-life term] is so devoid of even minimal rationality that it is unconstitutional as a matter of equal protection."'" (*Thompson, supra*, 112 Cal.App.5th at p. 1074, review granted, quoting *Williams, supra*, 17 Cal.5th at p. 123 & citing *Munoz, supra*, 110 Cal.App.5th at p. 510, review granted.)

Turning to the equal protection analysis, *Thompson* noted that although Senate Bill 9's legislative history indicates *Graham* violations and cruel or disproportionate sentences imposed on juveniles were among the Legislature's general considerations in enacting section 1170(d), "it was expressly concerned about juveniles being sentenced to *die* in prison." (*Thompson, supra*, 112 Cal.App.5th at p. 1075, review granted.) After examining various legislative reports analyzing Senate Bill 9, the court concluded those materials suggested "the Legislature's concern was not merely excessive punishment of juveniles that failed to take into consideration their capacity for change, or even lengthy sentences. Instead, a specific goal was to provide an opportunity for juvenile offenders whose sentences ensured they would die in prison." (*Thompson, supra*, at p. 1076, review granted.) *Thompson* pointed out the defendant had not shown these concerns stated in the legislative materials would have applied equally to sentences of 50 years to life as to sentences of LWOP. (*Ibid.*, review granted.)

*Thompson* also found the Legislative history established the Legislature intended to proceed incrementally with respect to addressing the larger problem of excessive punishment for juveniles. (*Thompson, supra*, 112 Cal.App.5th at p. 1076, review granted.) Senate Bill 9 was described as a "'modest and narrowly focused piece of legislation'" (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.) as introduced Dec. 6, 2010, p. 11), which financial reports indicated would apply to only 293 California inmates (Sen. Appropriations Com. Fiscal Summary of Sen. Bill

19.

No. 9 (2011–2012 Reg. Sess.) as introduced Dec. 6, 2010, pp. 1, 2). At the time of enactment, *Thompson* reasoned, the Legislature could reasonably have considered LWOP to be the most severe and unjust punishment imposed on juvenile offenders, and it could have rationally concluded that "providing the relatively small number of juvenile offenders otherwise certain to die in prison an opportunity to obtain a lesser sentence was the most pressing priority." (*Thompson, supra*, at p. 1077, review granted.) In light of that objective, the court reasoned it was rational for the Legislature to distinguish only juveniles sentenced to LWOP as compared to those with terms of 50 years to life because, prior to enactment of section 3051, it was only juveniles sentenced to LWOP who had a "100 percent chance of dying in prison." (*Thompson, supra*, at p. 1078, review granted.)

The court rejected the defendant's arguments of irrationality with respect to culpability, pointing to rational bases the Legislature may have had to benefit LWOP juveniles who, unlike those with lengthy term-of-years sentences, could not benefit from conduct credit and could be deprived of educational and rehabilitative opportunities, even if they had theoretically committed more egregious offenses than those serving lesser term-of-years sentences. (*Thompson, supra*, 112 Cal.App.5th at p. 1080, review granted.) Finally, *Thompson* joined *Munoz* in acknowledging that difficult questions remain regarding sentences with parole eligibility closer to the end of a juvenile's natural life expectancy, but noted its review was limited to the specific question before it. (*Thompson, supra*, at p. 1081, review granted.)

Finding *Thompson*'s equal protection analysis persuasive, we recently applied its reasoning in *Baldwin* to hold that, as applied to a term of 44 years to life for a juvenile nonhomicide offense, the defendant had not established section 1170(d)'s eligibility limitation to those sentenced expressly to LWOP violated equal protection principles. (*Baldwin, supra*, 113 Cal.App.5th at p. 985.)

20.

Against this backdrop, we turn to the specific equal protection challenge appellant makes here with respect to his sentence of 38 years to life.

## II.    Analysis

### A.    Equal Protection Principles

"The equal protection clause of the Fourteenth Amendment to the United States Constitution provides that no state may 'deny to any person within its jurisdiction the equal protection of the laws.'" (*Hardin, supra*, 15 Cal.5th at p. 847, fn. omitted, quoting U.S. Const., 14th Amend.)  "This provision is 'essentially a direction that all persons similarly situated should be treated alike.'  [Citation.]  'At core, the requirement of equal protection ensures that the government does not treat a group of people unequally without some justification.'  ([*People v.*] *Chatman* [(2018)] 4 Cal.5th [277,] 288.)"  (*Hardin, supra*, at p. 847.)

The justification required to satisfy equal protection hinges on the type of unequal treatment at issue.  (*Hardin, supra*, 15 Cal.5th at p. 847.)  Heightened scrutiny is applied when a challenged statute or regulation involves a suspect classification such as race, or a fundamental right such as the right to vote, and these classifications require greater justification for the differential treatment.  (*Ibid.*; *People v. Chatman* (2018) 4 Cal.5th 277, 288 (*Chatman*).)  However, when a statute involves none of these suspect classifications or fundamental rights, as a general rule the legislation is presumed to be valid and will be sustained if the classification is rationally related to a legitimate state interest.  (*Hardin, supra*, at p. 847.)  "A court applying this standard finds 'a denial of equal protection only if there is no *rational* relationship between a disparity in treatment and some legitimate government purpose.'  (*Chatman,* at pp. 288–289.)"  (*Ibid.*)

"Traditionally, the rational basis test has been described as a two-part inquiry, with courts '"first ask[ing] whether the state adopted a classification affecting two or more groups that are similarly situated in an unequal manner,"' and then '"consider[ing] whether the challenged classification" is adequately justified,' i.e., whether it '"bears a

21.

rational relationship to a legitimate state purpose."'" (*Hardin, supra,* 15 Cal.5th at p. 848.)" (*Williams, supra*, 17 Cal.5th at p. 124.)  In *Hardin*, the California Supreme Court held that "when plaintiffs challenge laws drawing distinctions between identifiable groups or classes of persons, on the basis that the distinctions drawn are inconsistent with equal protection, courts no longer need to ask at the threshold whether the two groups are similarly situated for purposes of the law in question." (*Hardin, supra*, at p. 850.)  The *Hardin* equal protection analysis governs this case where the issue presented is whether section 1170(d)(1)(A) violates equal protection by excluding a juvenile convicted of lengthy term-of-years sentences for recall and resentencing, while juveniles convicted of LWOP or its functional equivalent (pursuant to *Heard*) are eligible for such relief.

In this situation, like here, we are to "presume that a given statutory classification is valid 'until the challenger shows that no rational basis for the unequal treatment is reasonably conceivable.' [Citation.]  The underlying rationale for a statutory classification need not have been 'ever actually articulated' by lawmakers, nor 'be empirically substantiated.' [Citation.]  Evaluating potential justifications for disparate treatment, a court reviewing a statute under this standard must 'treat the statute's potential logic and assumptions far more permissibly than with other standards of constitutional or regulatory review.' [Citation.]  'If a plausible basis exists for the disparity, courts may not second-guess its "'wisdom, fairness, or logic.'"' [Citation.] '[T]he logic behind a potential justification need [not] be persuasive or sensible—rather than simply rational.'" (*Hardin, supra*, 15 Cal.5th at p. 852.)

The constitutional validity of a statute is a question of law reviewed de novo. (*People v. Alexander* (2023) 91 Cal.App.5th 469, 474; accord, *Sorto, supra*, 104 Cal.App.5th at p. 442.)

**B.      *Contreras***

Appellant argues, and the Attorney General tacitly agrees, that *Contreras*'s formulation of functional equivalence guides the analysis of an equal protection

challenge to section 1170(d) under *Heard*. Appellant points to various articles, data, and Eighth Amendment cases to support his contention that parole eligibility at 54 years old (as his sentence of 38 years to life provides) offers him no meaningful opportunities for release within his lifetime under *Contreras*. As such, he contends his sentence is functionally equivalent to LWOP for purposes of section 1170(d) and, pursuant to *Heard*, no rational bases support section 1170(d)'s eligibility limitation to those sentenced expressly to LWOP.

The Attorney General maintains a sentence of 38 years to life is not the functional equivalent of LWOP. According to the Attorney General, it is distinguishable from the longer sentences at issue in *Contreras* of 50 and 58 years to life, and more like the sentences of 30 and 33 years to life found *not* to be de facto LWOP in *People v. Perez* (2013) 214 Cal.App.4th 49 and *Olmos, supra,* 109 Cal.App.5th 580, respectively. The Attorney General argues appellant will be eligible for release at least by his later-middle age, and thus "has the opportunity then to become a productive citizen and reintegrate into society."

Although they reach different conclusions, both parties analyze appellant's equal protection challenge by importing *Contreras*'s Eighth Amendment formulation of functional equivalence, and then generally applying it within the traditional two-step equal protection analysis utilized in *Heard*. However, "the functional equivalence analysis in *Contreras* was built on, and expressly tethered to, Eighth Amendment concerns that do not necessarily extend to an equal protection analysis under the Fourteenth Amendment." (*Baldwin, supra,* 113 Cal.App.5th at p. 999.)[5]

---

[5] The trial court noted appellant will have opportunities for early parole before age 54, but specifically clarified that these opportunities did not factor into its decision. (See *Heard, supra*, 83 Cal.App.5th at p. 629 [declining to consider parole opportunities that did not exist at the time of sentencing]; accord, *Sorto, supra*, 104 Cal.App.5th at pp. 447–448.) Neither party argues on appeal that earlier parole opportunities are relevant to, or undercut, appellant's equal protection challenge.

23.

As observed in our Supreme Court's recent equal protection opinions, Eighth Amendment concerns "do not necessarily establish whether a Legislature's classification violates equal protection under a rational basis standard" (*Williams, supra*, 17 Cal.5th at p. 131), and our high court has "not held that a lengthy term-of-years sentence is necessarily equivalent to a [LWOP] sentence for all purposes" (*Hardin, supra*, 15 Cal.5th at p. 863). We understand from these cases that *Contreras*'s formulation of functional equivalency, particularly with its focus on Eighth Amendment concerns, does not necessarily apply to other legal contexts and analyses without regard for the nature of the legal question presented.

As held in *Baldwin*, in the context of an as-applied equal protection challenge to section 1170(d), rather than asking whether a particular term-of-years sentence functions like LWOP with respect to Eighth Amendment concerns that constrain lawful punishment for juvenile nonhomicide offenders under *Contreras*, we must instead ask whether a statutory distinction between LWOP and the term-of-years sentence at issue """"is so devoid of even minimum rationality that it is unconstitutional as a matter of equal protection"""" under the analytical framework articulated in *Hardin* and *Williams*. (*Baldwin, supra*, 113 Cal.App.5th at p. 1001, quoting *Thompson, supra*, 112 Cal.App.5th at p. 1074, review granted.) It is this latter question we turn to now.

### C. Rational Basis For Legislature to Treat Juvenile Offenders Sentenced to 38 Years to Life Differently From Juvenile's Sentenced to LWOP

The Legislature enacted what is now section 1170(d)(1)(A) in response to "concerns regarding sentences of [LWOP] for juvenile offenders." (*Kirchner, supra*, 2 Cal.5th at p. 1049; see Assem. Com. on Appropriations, Analysis of Sen. Bill. No. 9 (2011–2012 Reg. Sess.), as amended Aug. 15, 2011, pp. 3–5.) Although enacted after *Graham*, section 1170(d) was not designed to, nor does it, address Eighth Amendment violations in sentencing. As enacted, section 1170(d) resentencing relief is available only after a juvenile has been incarcerated for 15 years; it offers relief to homicide and

24.

nonhomicide juvenile offenders alike; it does not *require* a court to resentence *any* LWOP juvenile offender to a term-of-years; and it does not structure relevant resentencing factors to necessarily account for Eighth Amendment concerns. (§ 1170, former subd. (d)(2)(G); see *Kirchner, supra*, at p. 1052 ["section 1170(d)([1]) recall and resentencing process anticipates the lawfulness of a sentence of [LWOP] potentially subject to recall under its terms," and given its structure, it is not an adequate vehicle to address 8th Amend. error]; see also *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1385 [8th Amend. concerns of *Miller* and *Graham* not necessarily satisfied by opportunity for recall and resentencing under § 1170(d)].) While *Graham* was part of the Legislature's consideration in enacting section 1170(d)—as evidenced in the legislative history noting the decision (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.), as amended Aug. 15, 2011, p. 3)—legislative committee analyses reflect the Legislature's primary concern was with those juveniles whose sentences guaranteed their death in prison because they offered no opportunity for parole. (*Thompson, supra*, 112 Cal.App.5th at p. 1077, review granted.)

Specifically, legislative committee reports reflect concerns centered specifically on LWOP, not lengthy juvenile sentences generally. An Assembly Committee on Appropriations bill analysis included contentions of the bill's author and supporters that LWOP for juveniles is a "barbaric" sentence, "counter to principles of cognitive and emotional development in minors, and all but unprecedented in [the] rest of the world." (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.), as amended Aug. 15, 2011, p. 2; see *McHugh v. Protective Life Ins. Co.* (2021) 12 Cal.5th 213, 241 ["Where, as here, the author's statements are part of committee materials—and are therefore relayed not merely as personal views, but instead as part of the Legislature's consideration of the bill—they can serve as salient reflections of legislative purpose."].)

Both the Assembly Committee on Appropriations and the Assembly Committee on Public Safety issued analyses that discussed statistics provided by the Senate Bill 9's

25.

author that were specifically relevant only to LWOP. For example, both analyses referenced background facts showing "45% of the minors sentenced to LWOP did not personally commit murder, but were convicted of felony murder—as accomplices in a felony during which a murder was committed"; and that recent developments in brain science "'have proven that youth are far more influenced by group behavior than the same individuals will be as adults'"—"'[u]nsurprisingly, over 75% of the youth sentenced to LWOP acted within a group at the time of their crime.'" (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.), as amended Aug. 15, 2011, p. 3; see Assem. Com. on Public Safety, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.), as amended May 27, 2011, pp. 7–8.)

Also included were background facts provided by Senate Bill 9's author indicating many of California youth sentenced to LWOP were acting under the influence of an adult—in 70 percent of cases where the youth was not acting alone, at least one codefendant was an adult; and that California "'has one of the worst records in the nation for racial disparity in the imposition of [LWOP] for juveniles. African American youth are sentenced to [LWOP] at over 18 times the rate of white youth. Hispanic youth are sentenced to [LWOP] five times more often than white youth.'" (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.), as amended May 27, 2011, at pp. 7–8.) The analysis provided by the Assembly Committee on Appropriations also included information taken from a 2007 report by the Center for Law and Global Justice and the Frank C. Newman International Human Rights Law Clinic at the University of San Francisco School of Law that "'LWOP for minors violates customary international law .…'" (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.), as amended Aug. 15, 2011, p. 4.)

As explained in *Thompson* and *Baldwin*, this history "'suggests the Legislature's concern was not merely excessive punishment of juveniles that failed to take into consideration their capacity for change, or even lengthy sentences. Instead, a specific

26.

goal was to provide an opportunity for juvenile offenders whose sentences ensured they would die in prison.'" (*Baldwin, supra*, 113 Cal.App.5th at p. 1004, quoting *Thompson, supra*, 112 Cal.App.5th at p. 1076, review granted.) "At the time of enactment, the Legislature could reasonably consider [LWOP] to be the most severe and unjust punishment imposed on juvenile offenders." (*Thompson, supra,* at p. 1077, review granted.) Here, appellant has not demonstrated how the Legislature's concerns regarding the harshest punishments guaranteeing death in prison apply equally to those sentenced to 38 years to life with parole eligibility at 54 years of age.

Appellant cites research articles that were presented to the trial court dealing with the impact of incarceration on a juvenile offender's life expectancy, which included a finding that incarcerated adults tend to age at an accelerated rate that leads to a significant reduction in life expectancy.[6] Appellant argues these research articles are supported by data collected from the California Correctional Health Care System (CCHCS), which reported the average age of male inmates who died in custody in California in 2023 was 56. Appellant also emphasizes the uncertainty of being granted parole at the first opportunity, and cites various research articles not presented to the trial court to support his contention that his sentence does not allow him any meaningful opportunity to reintegrate into society.[7] Given these research articles and the data from CCHCS,

---

[6] The articles cited in appellant's trial court brief in support of the petition are as follows: Kaiksow et al., *Caring for the Rapidly Aging Incarcerated Population: The Role of Policy* (Mar. 2023) Journal of Gerontological Nursing 49(3): 7–11; Widra, *The Aging Prison Population: Causes, Costs and Consequences* (Aug. 2, 2023) Prison Policy Initiative <https://www.prisonpolicy.org/ blog/2023/08/02/aging> (as of Dec. 2, 2025), archived at <https://perma.cc/9MQV-KNYR>; Greene et al., *Older Adults in Jail: High Rates and Early Onset of Geriatric Conditions* (Feb. 17, 2018) Health & Justice 6(1): 3.

[7] The articles cited in appellant's brief on appeal are as follows: Haney, *The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment* (Nov. 30, 2001) <https://aspe.hhs.gov/ reports/psycholigcal-impact-incarceration-implications-post-prison-adjustment-0> (as of Dec. 2, 2025), archived at <https://perma.cc/TG98-FDXM>; Bell, *A Stone of Hope: Legal and Empirical Analysis of California Juvenile Lifer Parole Decisions* (2019) 54 Harv.

appellant argues his sentence, which offers parole eligibility at age 54, is functionally the same as LWOP. Framed within an equal protection analysis, appellant's argument can be understood to assert that, in enacting section 1170(d), the Legislature's concern about juveniles being condemned to die in prison apply equally to him, as he has an elevated chance of dying at a younger age—and there is no rational basis to differentiate those sentenced to LWOP from those sentenced to 38 years to life.

A similar argument was rejected in *Thompson*. (*Thompson, supra*, 112 Cal.App.5th at p. 1077, review granted.) The court reasoned that at the time of enactment, only those juveniles sentenced to LWOP "had a 100 percent chance of dying in prison." (*Id.* at p. 1078, review granted.) The court explained this was a distinction the Legislature "could rationally take into account." (*Ibid.*, review granted.) Even in light of appellant's data and articles indicating incarcerated individuals may have shorter average lifespans than the general population, and thus a juvenile serving a term of 38 years to life may be more likely to die before he reaches parole eligibility at age 54, the Legislature could have made a rational choice to target the harshest juvenile punishment first—i.e., the one that *guarantees* the juvenile will die in prison. (*Williams, supra*, 17 Cal.5th at pp. 124–125 [under rational basis review, """"we must accept any gross generalizations and rough accommodations that the Legislature seems to have made"""].) A term-of-years that offers parole eligibility at 54 years of age is not a sentence that guarantees death in prison, like LWOP or like sentences of 103 years to life (*Heard, supra*, 83 Cal.App.5th at p. 629), 140 years to life (*Sorto, supra*, 104 Cal.App.5th at p. 440) and 107 years to life (*Bagsby, supra*, 106 Cal.App.5th at p. 1047).

Moreover, the legislative history indicates the Legislature planned to proceed "incrementally in addressing the larger problem of excessive punishment of juvenile

L.Rev. 455; Hughes & ten Bensel, "*Stuck in their Ways": Examining Parole Officers' Perceptions on Guiding Older Offenders through the Reentry Process* (2022) 47 Am.J. of Crim. J. 287, 295–296.

offenders." (*Thompson, supra*, 112 Cal.App.5th at p. 1076, review granted.) The Senate Appropriations Committee's fiscal summary of Senate Bill 9 indicated the law would apply to only 293 inmates in California, and the anticipated fiscal impact was calculated accordingly. (Sen. Appropriations Com. Fiscal Summary of Sen. Bill No. 9 (2011–2012 Reg. Sess.) as introduced Dec. 6, 2010.) Further, the bill was described by supporters as a "'modest and narrowly focused piece of legislation'" given the limited number of inmates the bill was anticipated to affect. (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.) as introduced Dec. 6, 2010, p. 11.)

The Legislature could rationally determine that "providing the relatively small number of juvenile offenders otherwise certain to die in prison an opportunity to obtain a lesser sentence was the most pressing priority." (*Thompson, supra*, 112 Cal.App.5th at p. 1077, review granted.) While this excludes juveniles with lengthy term-of-years sentences that do not guarantee their death in prison, the Legislature is "entitled to proceed incrementally, so long as it proceeds rationally, in 'walking [the] tightrope' of the political process." (*Hardin, supra*, 15 Cal.5th at p. 866.) "'Nothing compels the state "to choose between attacking every aspect of a problem or not attacking the problem at all[.]" [Citation.] Far from having to "solve all related ills at once" [citation], the Legislature has "broad discretion" to proceed in an incremental and uneven manner without necessarily engaging in arbitrary and unlawful discrimination.'" (*Williams, supra*, 17 Cal.5th at p. 125, quoting *People v. Barrett* (2012) 54 Cal.4th 1081, 1110.)

In sum, like the 50 year-to-life sentence considered in *Thompson* and the 44 year-to-life sentence considered in *Baldwin*, as applied to a juvenile homicide offender sentenced to 38 years to life, appellant fails to demonstrate section 1170(d)'s eligibility limitation has no rational basis and is therefore unconstitutional under the Fourteenth Amendment. (*Williams, supra*, 17 Cal.5th at p. 130 ["We must uphold the Legislature's classification against an equal protection challenge unless 'it fairly can be said that there

is no "reasonably conceivable state of facts that could provide a rational basis for the classification."'"'"].)

**DISPOSITION**

The judgment is affirmed.


MEEHAN, J.

WE CONCUR:


LEVY, Acting P. J.


PEÑA, J.